SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**In re Renewal Application of TEAM Academy Charter School (A-45-19) (083014)**

**Argued April 26, 2021 -- Decided June 22, 2021**

**PATTERSON, J., writing for a unanimous Court.**

The Court considers whether the New Jersey Commissioner of Education (Commissioner) was required to analyze the potential segregative effect and the fiscal impact of the enrollment expansions proposed by seven Newark charter schools.

In Fall 2015, seven Newark charter schools submitted applications to either renew or amend their charters. All seven sought to increase their enrollments. In accordance with N.J.A.C. 6A:11-2.3(b)(9) and -2.6(c), the Newark Public Schools (District), then operated under State supervision, provided individualized comments and/or recommendations to the Commissioner regarding six of the charter schools' applications. The District, however, did not raise a challenge or make a showing that the proposed charter school expansions would prevent it from providing to its students the "thorough and efficient" education that the Constitution requires. N.J. Const. art. VIII, § 4, ¶ 1.

The Education Law Center (ELC) objected to the applications. It argued that any expansion of Newark's charter schools would worsen the District's financial crisis, thus impeding the District's effort to deliver a "thorough and efficient" education, and that further growth in charter school enrollment would exacerbate segregation in the District's schools. ELC asked the Commissioner to hold a hearing and develop an evidentiary record on the issues that it raised.

In February 2016, the Commissioner issued seven letters granting the applications of the charter schools to renew or amend their charters. None of the seven letters addressed the impact of the proposed expansions on the student composition of the charter school or the potential segregative effect of those expansions on the schools or the District. None made any reference to ELC's assertion that any expansion of Newark charter school enrollment would impose fiscal harm on the District. Pursuant to the Commissioner's decisions, all seven charter schools expanded their enrollments.

The Appellate Division upheld the Commissioner's determinations. 459 N.J. Super. 111, 140-49 (App. Div. 2019). The Court granted certification. 241 N.J. 1 (2020).

1

**HELD:**       *If a charter school's "district of residence demonstrates with some specificity that the constitutional requirements of a thorough and efficient education would be jeopardized" by the diversion of district funding to a charter school, the Commissioner must "evaluate carefully" the question of fiscal harm.  In re Englewood on the Palisades Charter Sch. (Englewood), 164 N.J. 316, 334-35 (2000).  Here, however, the District made no such preliminary showing.  The Court declines to depart from the governing standard simply because the District is a former Abbott district or because the District was State-operated at the time of the charter school applications.

*The Commissioner did not address "the racial impact that a charter school applicant will have on the district of residence in which the charter school will operate," as mandated in Englewood, id. at 329.  Nor did the Commissioner's decisions discuss the potential effect of the charter expansions on the percentage of charter school students and students in District-operated schools who are English language learners or students with disabilities.  In determining future applications to open new charter schools or to expand charter school enrollment or facilities, the Commissioner should thoroughly address both issues.  But the Court does not disturb the Commissioner's grant of the charter school expansion applications challenged in this appeal.

1.  In the Charter School Program Act of 1995 (Charter School Act or Act), N.J.S.A. 18A:36A-1 to -18, the Legislature declared "that the establishment of a charter school program is in the best interests of the students of this State and it is therefore the public policy of the State to encourage and facilitate the development of charter schools." N.J.S.A. 18A:36A-2.  Consistent with that declaration, the Legislature directed the Commissioner to "actively encourage the establishment of charter schools in urban school districts with the participation of institutions of higher education."  Id. at -3(b). The Court reviews the provisions of the Act, including those that govern the charter school application and renewal processes, see id. at -4, -17; the Commissioner's annual review of charter school performance, id. at -16(a); and the prescriptions that the charter school admissions process be open and non-discriminatory, id. at -7, and that it, "to the maximum extent practicable, seek the enrollment of a cross section of the community's school age population including racial and academic factors," id. at -8(e).  (pp. 24-27)

2.  The State Board of Education adopted regulations pursuant to the Act that set forth the procedures for the two categories of applications relevant to this appeal.  N.J.A.C. 6A:11-2.3 governs the procedure for charter renewals.  The regulation directs the Commissioner to "grant or deny" a renewal application based on twelve enumerated criteria.  N.J.A.C. 6A:11-2.3(b)(1) to (12).  It provides that "[t]he Commissioner shall notify a charter school regarding the granting or denial," and "[t]he notification to a charter school that is not granted a renewal shall include reasons for the denial."  Id. at -2.3(d).  The regulation does not address an obligation to explain the basis for granting a renewal.  See ibid. N.J.A.C. 6A:11-2.6 addresses charter amendments.  After a charter school applies to amend its charter, "[t]he Commissioner shall review a charter school's performance data

2

in assessing the need for a possible charter amendment." Id. at -2.6(b). "The district board(s) of education or State district superintendent(s) of the district of residence of a charter school may submit comments" on the proposed amendment. Id. at -2.6(c). "The Commissioner may approve or deny amendment requests of charter schools and shall notify charter schools of decisions." Id. at -2.6(d). (pp. 27-29)

3. The Legislature's declaration of public policy in the Charter School Act and the regulations implemented pursuant to the statute provided the setting for the Court's decision in Englewood. There, the Court upheld the statute's constitutionality. 164 N.J. at 323. That holding, however, was premised on two requirements imposed on the Commissioner: a mandate that the Commissioner address the issue of segregative effect, and a requirement that the Commissioner assess the question of fiscal harm if the district of residence makes an initial showing of such harm. Id. at 323-36. The Court first addressed the prospect that the growth of charter schools would exacerbate racial segregation. Id. at 323-30. The Court held "that the Commissioner must assess the racial impact that a charter school applicant will have on the district of residence in which the charter school will operate." Id. at 329. In the wake of Englewood, the Department of Education (Department) promulgated regulations codifying the Commissioner's duty to consider a charter school's segregative effect on its district of residence, see 32 N.J.R. 3560(a) (Oct. 2, 2000), such that the Commissioner is required to assess a charter school expansion's impact on the district's racial and ethnic balance "during the charter school's initial application, continued operation, and charter renewal application," In re Red Bank Charter Sch., 367 N.J. Super. 462, 472 (App. Div. 2004). (pp. 29-32)

4. In Englewood, the Court also defined the Commissioner's obligation to analyze the fiscal impact of a charter school approval on the district of residence, but limited that obligation to settings in which the district makes a preliminary showing of fiscal harm. 164 N.J. at 330-36. The Englewood Court reiterated the Commissioner's continuing obligation to be vigilant about the "district of residence's continuing ability to provide a thorough and efficient education to its remaining pupils," but concluded that "[r]ead in combination," N.J.S.A. 18A:36A-4(c)'s provision for district comments on a charter school application and N.J.S.A. 18A:36A-12's funding mechanism "require a district of residence to make an initial showing that" paying to charter schools the per-pupil amount assessed under section -12 "would impede, or prevent, the delivery of a thorough and efficient education in that district." Id. at 334. The Court noted in Englewood that "application of this standard in the context of an Abbott district is not part of this case," and left "that question for another day." Ibid. In Red Bank, the Appellate Division held that the duty as defined in Englewood applies with equal force to the renewal setting. 367 N.J. Super. at 482-83. Thus, a district's duty under Englewood to present a preliminary showing of fiscal harm sufficient to imperil its provision of a thorough and efficient education -- a showing sufficient to trigger the Commissioner's analysis of the charter school's fiscal impact -- applies to the renewal and amendment settings of this appeal. Ibid. (pp. 32-35)

3

5.  Against that backdrop, the Court reviews the Commissioner's February 2016 decisions, considering first whether the Commissioner was required to analyze the fiscal harm to the District as a result of the proposed charter school expansions.  The Court explains why there is no reason to exempt former Abbott districts from Englewood's general requirement of a preliminary showing of fiscal harm in order to trigger the Commissioner's responsive duty to assess that question.  The Court notes in particular the Legislature's enactment of the School Funding Reform Act of 2008, N.J.S.A. 18A:7F-43 to -70.  Further, the practical considerations identified by the Commissioner as to a district's unique familiarity with its own finances apply in equal measure to all school districts.  The Court adds that the District's former status as a State-operated school district also does not warrant an exception to Englewood's preliminary showing mandate.  Such an exception would be inconsistent with the Legislature's expectation that a State-appointed superintendent will effectively represent a district's interests with respect to charter schools.  Because the District made no showing of fiscal harm, the Commissioner was not required to address fiscal harm before approving the seven charter school applications at issue here.  (pp. 36-43)

6.  The Commissioner's decisions granting renewals or amendments to the respondent charter schools did not include any reference to the schools' potential impact on racial segregation in the district schools, much less the careful consideration of that issue that Englewood requires.  The decisions are therefore deficient.  The Court holds that in future charter school application determinations, the Commissioner should address the impact of the charter school's approval, renewal or amendment (1) on racial segregation in the district of residence, and (2) on the demographic composition of the district of residence with respect to two groups of students of particular concern to the Legislature, students with disabilities and students who are English language learners.  (pp. 44-45)

7.  Although the Commissioner did not conduct the segregative-impact analysis that Englewood required, a remand of these matters to the Commissioner five years after the decisions would not serve the interests of Newark's charter school students or their families.  ELC and the District urge the Court to instruct the Commissioner to prospectively deny or limit pending and future applications to expand Newark charter schools so that the schools' collective enrollments return to pre-2016 levels.  The Court declines to play such an active role, which would interfere with educational determinations that are imbued with the expertise of the Commissioner and the Department's staff.  Such a global and prospective order would not be an appropriate remedy in the seven renewal and amendment applications at issue here, and it would not take into account developments in the intervening years.  (pp. 45-47)

   **AFFIRMED AS MODIFIED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE PATTERSON's opinion.**

4

SUPREME COURT OF NEW JERSEY

A-45 September Term 2019

083014

In re Renewal Application of
TEAM Academy Charter School.

_____

In re Renewal Application of
Robert Treat Academy Charter School.

_____

In re Renewal Application of
North Star Academy Charter School of Newark.

_____

In re Amendment Request to
Increase Enrollment of
Maria L. Varisco-Rogers Charter School.

_____

In re Amendment Request to
Increase Enrollment of
University Heights Charter School.

_____

In re Amendment Request to
Increase Enrollment of
Great Oaks Legacy Charter School.

_____

In re Amendment Request to
Increase Enrollment of
New Horizons Community Charter School.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
459 N.J. Super. 111 (App. Div. 2019).

1

| Argued | Decided |
|--------|---------|
| April 26, 2021 | June 22, 2021 |

David G. Sciarra argued the cause for appellant
Education Law Center (Pashman Stein Walder Hayden
and Education Law Center, attorneys; Michael S. Stein,
Brendan M. Walsh, Ranit S. Shiff, David G. Sciarra,
Elizabeth A. Athos, and Jessica A. Levin, on the briefs).

Donna Arons, Assistant Attorney General, argued the
cause for respondent New Jersey Commissioner of
Education (Gurbir S. Grewal, Attorney General, attorney;
Melissa Dutton Schaffer and Melissa H. Raksa, Assistant
Attorneys General, and Donna Arons, of counsel, and
Geoffrey N. Stark, Christopher Weber, Lauren A. Jensen,
and Aimee Blenner, Deputy Attorney Generals, on the
briefs).

Thomas O. Johnston argued the cause for respondents
TEAM Academy Charter School, Robert Treat Academy
Charter School, North Star Academy Charter School of
Newark, University Heights Charter School, Great Oaks
Legacy Charter School, and New Horizons Community
Charter School (Johnston Law Firm, attorneys; Thomas
O. Johnston, of counsel and on the briefs, Barbara J. Bohi
and Rula A. Moor, on the briefs).

Joel M. Miklacki argued the cause for respondent Maria
L. Varisco-Rogers Charter School (Law Offices of Joel
M. Miklacki, attorneys); Adam S. Herman and Daniel
Schlein, on the brief (Adams Gutierrez & Lattiboudere).

Brenda C. Liss argued the cause for amicus curiae Board
of Education of the City of Newark (Newark Board of
Education Office of General Counsel, attorneys; Brenda
C. Liss, of counsel and on the briefs, and Arsen Zartarian
and Elijah Johnson, Jr., on the briefs).

Michael R. Noveck argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Gibbons and American Civil Liberties Union of New Jersey Foundation, attorneys; Lawrence S. Lustberg, Michael R. Noveck, Alexander Shalom, Karen D. Thompson, and Jeanne LoCicero, on the brief).

Justin Schwam argued the cause for amici curiae American Federation of Teachers, AFL-CIO; AFT New Jersey, AFL-CIO; Newark Teachers Union, AFT, AFL-CIO (Weissman & Mintz, attorneys; Justin Schwam, of counsel and on the brief, and Steven P. Weissman, on the brief).

Paul P. Josephson argued the cause for amici curiae New Jersey Public Charter Schools Association and New Jersey Children's Foundation (Duane Morris, attorneys; Paul P. Josephson, and Joseph M. Casole, on the brief).

William C. Morlok submitted a brief on behalf of amicus curiae Franklin Township Board of Education (Parker McCay, attorneys; William C. Morlok, on the brief).

Philip E. Stern submitted a brief on behalf of amicus curiae Plainfield Board of Education (DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, attorneys; Philip E. Stern, and Amy A. Pujara, on the brief).

Ronald C. Hunt submitted a brief on behalf of amici curiae Paterson Board of Education and Irvington Board of Education (Hunt, Hamlin & Ridley, attorneys; Ronald C. Hunt, of counsel and on the brief).

Ezra Rosenberg submitted a brief on behalf of amici curiae Lawyers' Committee for Civil Rights Under Law and Constitutional and Education Law Scholars (Lawyers' Committee for Civil Rights Under Law, attorneys; Ezra Rosenberg, David Hinojosa, of the Texas and New Mexico bars, admitted pro hac vice, and Genevieve Bonadies Torres, of the California and District of Columbia bars, admitted pro hac vice, on the brief).

3

This appeal arises from seven Newark charter schools' applications to the New Jersey Commissioner of Education (Commissioner) to amend or renew their charters pursuant to the Charter School Program Act of 1995 (Charter School Act), N.J.S.A. 18A:36A-1 to -18.  All of the charter schools sought to increase their enrollment, beginning in the 2016-2017 school year, and three of the schools also applied to expand their facilities to accommodate more students.

The Newark Public Schools (District), then operated under State supervision pursuant to N.J.S.A. 18A:7A-34, submitted comments to the Commissioner in response to six of the charter school applications.  The District, however, did not raise a challenge or make a showing that the proposed charter school expansions would prevent it from providing to its students the "thorough and efficient" education that the Constitution requires. N.J. Const. art. VIII, § 4, ¶ 1.

Appellant, the Education Law Center (ELC), objected to the applications.  It argued that any expansion of Newark's charter schools would worsen the District's financial crisis, thus impeding the District's effort to deliver a "thorough and efficient" education, and that further growth in charter school enrollment would exacerbate segregation in the District's schools.

In brief letters to the charter schools, the Commissioner granted the seven applications. The Commissioner did not include in the letters the analysis of the potential segregative effect of the proposed charter school expansions that was required by this Court's opinion in In re Englewood on the Palisades Charter School (Englewood), 164 N.J. 316, 323-30 (2000), and by regulations adopted after that decision. In the absence of any claim by the District that the charter schools' expansions would impose fiscal harm on the District, the Commissioner's letters did not address the fiscal impact of the charter school applications.

ELC appealed. It argued that when a charter school seeking to expand enrollment is in a former Abbott district, previously subject to judicial remedies imposed in the Abbott v. Burke[1] litigation, no preliminary showing of fiscal harm by the district of residence should be required, and the Commissioner should bear the burden of showing that a charter expansion would not jeopardize the District's capacity to provide a "thorough and efficient" education to its students. It also asserted that the Commissioner's determinations were arbitrary, capricious and unreasonable because he did not address the question of segregative effect.

---

[1] See Abbott v. Burke (Abbott II), 119 N.J. 287, 394-97 (1990).

The Appellate Division affirmed the Commissioner's decisions. In re TEAM Acad. Charter Sch., 459 N.J. Super. 111, 140-49 (App. Div. 2019). The court ruled that in the absence of a preliminary showing by the District that the proposed charter school expansions would impair its ability to provide a thorough and efficient education, the Commissioner was not required to discuss the question of fiscal harm in his decisions. Id. at 140-44. The appellate court acknowledged that the Commissioner's letters did not address the segregative impact of each charter school's proposed expansion but concluded that ELC had not substantiated its allegations of discriminatory enrollment procedures or other segregative practices by the charter schools. Id. at 144-46.

We granted in part ELC's petition for certification. We also granted amicus curiae status to the Board of Education of the City of Newark (Board of Education), which now operates the District and supports ELC's position, and to several other organizations.

We reiterate our holding in Englewood that if a charter school's "district of residence demonstrates with some specificity that the constitutional requirements of a thorough and efficient education would be jeopardized" by the diversion of district funding to a charter school, the Commissioner must "evaluate carefully" the question of fiscal harm. 164 N.J. at 334-35. Here,

6

however, the District made no such preliminary showing. We decline to depart from the governing standard simply because the District is a former Abbott district or because the District was State-operated at the time of the charter school applications.

We agree with ELC that the Commissioner did not address "the racial impact that a charter school applicant will have on the district of residence in which the charter school will operate," as this Court mandated in Englewood, id. at 329. Nor did the Commissioner's decisions discuss the potential effect of the charter expansions on the percentage of charter school students and students in District-operated schools who are English language learners or students with disabilities. We hold that in determining future applications to open new charter schools or to expand charter school enrollment or facilities, the Commissioner should thoroughly address both issues.

Five years after the Commissioner's approval of the seven charter school applications, however, it would be impractical and unfair to revisit his decisions. Any decision reversing the Commissioner's determinations could disrupt the educations of thousands of students in Newark's charter schools, and might also undermine later decisions on charter school enrollment made by the Commissioner in the wake of the 2016 expansions disputed here.

7

Accordingly, we do not disturb the Commissioner's grant of the charter school expansion applications challenged in this appeal.

## I.

### A.

On July 5, 1995, the Commissioner invoked his authority under N.J.S.A. 18A:7A-15, -15.1, and -34 to remove the Board of Education and establish a State-operated school district in Newark. See Contini v. Bd. of Educ., 96 N.J.A.R.2d (EDU) 196, at *61-62, 1995 N.J. AGEN LEXIS 665, at *185-88. Pursuant to N.J.S.A. 18A:7A-35, the State Board of Education appointed a State district superintendent of schools to oversee the District. The District remained State-operated until July 1, 2020, when the State Board of Education voted to restore District operations to local control. See Office of the Governor, Press Release: Murphy Administration Announces Return to Full Local Control to Newark School District (July 1, 2020), https://www.nj.gov/governor/news/news/562020/20200701a.shtml.

### B.

#### 1.

On October 15, 2015, respondent TEAM Academy Charter School (TEAM Academy) applied to the Commissioner to renew its charter in accordance with N.J.S.A. 18A:36A-17 and N.J.A.C. 6A:11-2.3(b)(1). In an

amended application, TEAM Academy sought to increase its authorized enrollment over five school years from 4,120 students to 9,560 students and to expand its facilities.

On October 15, 2015, respondent Robert Treat Academy Charter School (Robert Treat Academy) applied to the Commissioner to renew its charter in accordance with N.J.S.A. 18A:36A-17 and N.J.A.C. 6A:11-2.3(b)(1).  Robert Treat Academy sought to expand its authorized enrollment from 695 students to 860 students over four school years and to relocate the school to a new facility.

On October 15, 2015, respondent North Star Academy Charter School (North Star Academy) applied to the Commissioner to renew its charter in accordance with N.J.S.A. 18A:36A-17 and N.J.A.C. 6A:11-2.3(b)(1).  North Star Academy sought to expand its authorized enrollment from 4,950 students to 6,550 students over five school years, but noted that it had received prior approval for at least part of its anticipated enrollment expansion.

On December 8, 2015, respondent Maria L. Varisco-Rogers Charter School (Varisco-Rogers) applied to the Commissioner to amend its charter in accordance with N.J.A.C. 6A:11-2.6(a).  Varisco-Rogers sought to increase its authorized enrollment from 515 students to 540 students in the following school year.

On November 25, 2015, respondent University Heights Charter School (University Heights) applied to the Commissioner to amend its charter in accordance with N.J.A.C. 6A:11-2.6(a). University Heights sought to increase its authorized enrollment from 650 students to 1,500 students over four school years and to expand its facilities.

By letter dated October 6, 2015, respondent Great Oaks Charter School (Great Oaks) applied to the Commissioner to amend its charter in accordance with N.J.A.C. 6A:11-2.6(a). Great Oaks sought to increase its authorized enrollment from 462 students to 939 students over four school years.

On November 29, 2015, respondent New Horizons Community Charter School (New Horizons) applied to the Commissioner to amend its charter in accordance with N.J.A.C. 6A:11-2.6(a). New Horizons sought to increase its authorized enrollment from 504 students to 756 students for the following school year.

2.

In accordance with N.J.A.C. 6A:11-2.3(b)(9) and -2.6(c), the District provided individualized comments and/or recommendations to the Commissioner regarding six of the charter school renewal and amendment applications.

The District recommended that the Commissioner deny TEAM Academy's renewal application or, alternatively, that the Commissioner approve the application in part, noting the Commissioner's request that TEAM Academy submit a revised expansion request with a lower proposed increase in enrollment. It recommended partial approval of Robert Treat Academy's renewal application, suggesting that the Commissioner limit the increase in kindergarten enrollment to 80 students, rather than the 108-student enrollment requested. The District made no recommendation with respect to North Star Academy's renewal application.

The District recommended that the Commissioner approve the amendment application submitted by Varisco-Rogers. It urged the Commissioner to deny University Heights' amendment application or, alternatively, to approve that application in part by authorizing the expansion of pre-kindergarten and kindergarten classes to 100 students rather than the 150 requested and denying the school's proposed expansion of its fifth grade. The District recommended that the Commissioner approve in part Great Oaks' amendment request, suggesting that the school be permitted to expand its sixth grade to 125 students instead of the 177 students it had requested to enroll, with later expansions in higher grades.

The District did not make any showing before the Commissioner that the grant of any of the seven charter school applications would jeopardize its ability to satisfy the constitutional mandate of a thorough and efficient system of education.  See In re Proposed Quest Acad. Charter Sch., 216 N.J. 370, 377-78 (2013); Englewood, 164 N.J. at 334-35.

3.

In a letter to the Commissioner dated January 28, 2016, ELC requested, "on behalf of public school children in the State-operated Newark Public Schools," that the Commissioner deny all expansion applications submitted by charter schools in Newark.

Other than to cite the expansion requests of TEAM Academy, North Star Academy, and Robert Treat as examples of the applications made by Newark charter schools, ELC did not individually address any of the charter school applications at issue.  It argued generally that Newark charter schools' expansion applications should be denied "as beyond the scope of an amendment to an existing charter under the [Charter School Act] and implementing regulations."  ELC asserted that "the financial stress of underfunding" the School Funding Reform Act of 2008 (SFRA), N.J.S.A. 18A:7F-43 to -70, and the Department of Education's (Department's) approval of "a rapid expansion of charter school enrollments" had a significant negative

impact on the financial resources of the District.  ELC also advised the Commissioner that continued expansion of Newark charter schools would "exacerbate the already glaring disparities in the demographics of students served in Newark charters compared to [District]-run schools and will further concentrate the most at-risk students in [D]istrict schools."

Relying on two reports analyzing the Department's publicly available data about charter schools,[2] ELC contended that the Commissioner had the obligation under this Court's decision in Quest Academy, 216 N.J. at 377-78, to "evaluate carefully the impact that loss of funds would have on the ability of the district of residence to deliver a thorough and efficient education."  ELC advised the Commissioner that he had "an even greater obligation to evaluate the impact" of the loss of District funds to charter schools because Newark "is an urban district subject to the remedial mandates of the Abbott v. Burke rulings."

ELC asked the Commissioner to hold a hearing and develop an evidentiary record on the issues that it raised.

---

[2]  The reports relied on in ELC's January 28, 2016 letter to the Commissioner are (1) Danielle Farrie & Monete Johnson, Education Law Center, Newark Public Schools:  Budget Impacts of Underfunding and Rapid Charter Growth (2015), and (2) Mark Weber & Julia Sass Rubin, New Jersey Charter Schools: A Data-Driven View, Part I (2014).

## C.

In February 2016, the Commissioner issued seven letters granting the applications of the charter schools to renew or amend their charters.

In his letters to the three charter schools that had applied to renew their charters -- TEAM Academy, Robert Treat Academy, and North Star Academy -- the Commissioner stated that he had conducted a "comprehensive review" of the school's renewal application "[p]ursuant to N.J.S.A. 18A:36A-17 and N.J.A.C. 6A:11-2.3(b)." In each renewal letter, the Commissioner indicated that he had reviewed "the school's renewal application, annual reports, student performance on state assessments, site visit results, public comments, and other information," and he summarized the school's academic achievements. In each letter, the Commissioner instructed the charter school on the steps necessary to formalize its charter renewal, and congratulated the school on its accomplishments.

In his letter to TEAM Academy, the Commissioner authorized the school to expand its enrollment to 4,525 students in the 2016-2017 school year and to 7,920 students in the 2020-2021 school year. In his letter to Robert Treat Academy, the Commissioner authorized the school to expand its enrollment to 720 students in the 2016-2017 school year and to 860 students in the 2020-2021 school year. In his letter to North Star Academy, the Commissioner

authorized the charter school to expand its enrollment from 4,712 students in the 2016-2017 school year to 6,550 students in the 2020-2021 school year.

In his letters to the four charter schools that had applied to amend their charters -- Varisco-Rogers, University Heights, Great Oaks, and New Horizons -- the Commissioner noted that N.J.A.C. 6A:11-2.6 authorized charter schools to request such amendments. In each amendment letter, the Commissioner stated that the Department "has evaluated the school's request based on a review of its academic, operational, and fiscal standing as well as an analysis of public comments, fiscal impact on sending districts, and other information in order to make a decision regarding the school's amendment request." In each letter, the Commissioner indicated that he had reviewed the school's submission in support of its proposed expansion, and summarized the school's achievements.

In his letter to Varisco-Rogers, the Commissioner authorized the charter school to expand its enrollment to a total of 540 students for the 2016-2017 and 2017-2018 school years. In his letter to University Heights, the Commissioner authorized the charter school to expand its enrollment, but limited the requested expansion to an increase from 750 students in the 2016-2017 school year to 1,050 students in the 2019-2020 school year. In his letter to Great Oaks, the Commissioner authorized the charter school to expand its

15

enrollment to 639 students in the 2016-2017 school year and 939 students in the 2019-2020 school year. In his letter to New Horizons, the Commissioner authorized the charter school to expand its enrollment to 588 students in the 2016-2017 school year and 672 students for the 2017-2018 school year.

None of the seven letters addressed the impact of the proposed expansions on the student composition of the charter school or the potential segregative effect of those expansions on the schools or the District. None made any reference to ELC's assertion that any expansion of Newark charter school enrollment would impose fiscal harm on the District.

Pursuant to the Commissioner's decisions, all seven charter schools expanded their enrollments.

### D.

ELC appealed the Commissioner's decisions granting the charter schools' applications. Applying the "arbitrary, capricious, or unreasonable" standard governing judicial review of agency decisions, the Appellate Division upheld the Commissioner's determinations. In re TEAM Acad., 459 N.J. Super. at 140-49.

The Appellate Division rejected ELC's contention that the Commissioner was required to assess the fiscal impact of the charter schools' proposed enrollment increases on the District, notwithstanding the absence of

16

any showing of such fiscal impact by the District itself.  Id. at 140-44.  The court stated that no burden is imposed on the Commissioner to "canvass[] the financial condition of the district of residence in order to determine its ability to adjust to the per-pupil loss upon approval of the charter school based on unsubstantiated, generalized protests."  Id. at 141 (quoting Englewood, 164 N.J. at 336).  Instead, the court reasoned, "[t]he Commissioner is entitled to rely on the district of residence to come forward with a preliminary showing that the requirements of a thorough and efficient education cannot be met."  Ibid. (quoting Englewood, 164 N.J. at 334).

The Appellate Division rejected ELC's argument that the Commissioner "has a heightened obligation to scrutinize and evaluate appropriate funding in Abbott school districts," and ELC's contention that the State "should bear the burden of proving the District can provide a thorough and efficient education to its public schools even if the charter schools' applications are approved."  Id. at 143-44.  In light of the Legislature's imposition of a new funding formula through SFRA, the court found no reason to apply a special standard with respect to fiscal harm to former Abbott districts.  Id. at 144.

The Appellate Division acknowledged that the Commissioner had not addressed the potential segregative effect of the charter school expansions.  Id. at 144-46.  It found ELC's showing on the question of segregative effect to be

17

deficient, however, and found no evidence of discriminatory practices by the charter schools.  Ibid.

## E.

We granted ELC's petition for certification limited to the following issues:  (1) whether the Appellate Division erred when it did not find the Commissioner's decisions to be arbitrary, capricious, and unreasonable based on his failure to address segregation by disability, English language proficiency, and race; (2) whether the Appellate Division erred when it did not find the Commissioner's decisions to be arbitrary, capricious, and unreasonable based on his failure to evaluate funding loss impacts on the District; and (3) whether the Appellate Division erred when it declined to impose a heightened obligation on the Commissioner to evaluate funding loss impacts in charter school applications in former Abbott districts.  241 N.J. 1 (2020).[3]

We granted the applications of the following entities to appear as amici curiae:  the Newark Board of Education; the American Civil Liberties Union of New Jersey; the American Federation of Teachers, AFT New Jersey, AFL-CIO and the Newark Teachers Union, AFT, AFL-CIO, appearing jointly; the

---

[3]  We denied ELC's petition for certification with respect to its challenge to the Commissioner's grant of several charter schools' requests to expand their facilities.  See 241 N.J. at 1.

18

Franklin Township Board of Education; the Plainfield Board of Education; the Paterson Board of Education and the Irvington Board of Education, appearing jointly; the Lawyers' Committee for Civil Rights Under Law and Constitutional and Education Law Scholars, appearing jointly; and the New Jersey Public Charter Schools Association and the New Jersey Children's Foundation, appearing jointly.

## II.

## A.

ELC contends that the Appellate Division should have ordered the Commissioner to address the potential segregative effect of the requested charter school expansions based on race, disability status and English language proficiency in accordance with Englewood, 164 N.J. at 334-35. It urges the Court to exclude Abbott districts and State-operated districts from the requirement that a school district of residence make a preliminary showing of fiscal harm. ELC also argues that the Court should shift the burden to the Commissioner to "convincingly demonstrate" that a charter expansion "would not impair [the District's] funding or undermine [the District's] ability to provide a thorough and efficient education." Although ELC represents that it does not seek to remove students from the seven charter schools, it requests that the Court reverse the Commissioner's 2016 decisions allowing those

19

schools to expand their enrollment and remand for public hearings on those expansion requests.

B.

Asserting that charter schools accommodate the high demand for high-quality educational options in Newark, the Commissioner argues that the Legislature has determined that the promotion of charter schools is in the best interests of students. The Commissioner argues that a district of residence should bear the burden to make a showing of fiscal impact in opposition to a charter school application, given the district's unique understanding of its own financial status and funding needs, and that no heightened standard should be imposed on the Commissioner when a charter school is located in a former Abbott district. The Commissioner contends that there was no need to respond to ELC's assertions of fiscal harm in the absence of a preliminary showing by the District. The Commissioner states that the record does not substantiate ELC's claim that the charter school expansion applications had a segregative effect on charter schools or District-operated schools.

C.

Respondents TEAM Academy, Robert Treat Academy, North Star Academy, University Heights, Great Oaks, and New Horizons, appearing jointly, and respondent Varisco-Rogers argue that former Abbott districts, like

other school districts, must make an initial showing of fiscal harm before the Commissioner is required to address that question in a charter school decision. They assert that in the absence of such a showing, the Commissioner had no obligation to assess fiscal harm, and that the Commissioner was not required to state in formal findings his reasons for granting their applications to renew or amend their charters. With respect to the question of segregative effect, the charter schools note that most of them recruit students through the District's universal enrollment system, which prioritizes the enrollment preferences of students with disabilities. They argue that the demographic characteristics of a given school's student body reflect the neighborhood in which the school is located and that there is no evidence in the record that charter school expansion exacerbates segregation.

D.

Amicus curiae the District notes that the Commissioner failed to address segregative effect in his decisions approving the expansion of the charter schools and argues that the Court should reverse those decisions. It contends that a former Abbott district should not be required to make a preliminary showing of fiscal harm and asserts that the Court should view its former status as a State-operated school district as "part of the context" of the proceedings before the Commissioner. The District urges the Court to order the

21

Commissioner to limit Newark charter school enrollments to pre-2016 levels when it considers pending renewal requests by three of the charter schools and assesses the continued operations of the other charter schools.

E.

Amicus curiae the American Civil Liberties Union of New Jersey argues that the Commissioner's brief letters do not provide an adequate basis for judicial review. Amicus asserts that the Commissioner should be compelled to address the segregative effect of the applications and that, in former Abbott districts, no showing by the District should be required to compel an analysis of fiscal harm.

F.

Amici curiae the Plainfield, Paterson, and Irvington Boards of Education claim that charter school growth has exacerbated segregation and fiscal challenges in their districts. Amicus curiae the Franklin Township Board of Education asserts that the Commissioner improperly failed to analyze the segregative effects of charter schools.

G.

Amici curiae the American Federation of Teachers, AFT New Jersey, AFL-CIO, and the Newark Teachers Union, AFT, AFL-CIO claim that charter schools have a negative fiscal impact and a segregative effect on districts of

22

residence. They assert that the Court should require the Commissioner to carefully evaluate the fiscal and segregative impacts of charter applications in Newark and other former Abbott districts.

## H.

Amici curiae Lawyers' Committee for Civil Rights Under Law and Constitutional and Education Law Scholars urge the Court to impose on the Commissioner an affirmative duty to ensure that the transfer of resources to charter schools will not jeopardize the District's provision of a thorough and efficient education to its students. Amici contend that charter schools exacerbate segregative patterns in Newark and elsewhere.

## I.

Amici curiae the New Jersey Public Charter Schools Association and the New Jersey Children's Foundation, citing funding increases and academic progress in the District schools since the Commissioner approved the charter school expansions, argue that the fiscal harm that ELC anticipated has not occurred. They assert that a reversal of the Commissioner's decisions would harm students whom the Abbott rulings were intended to protect. Amici argue that distinctions among neighborhoods, not charter schools, engender segregation in the Newark schools.

## III.

### A.

When it enacted the Charter School Act, the Legislature articulated a State policy in favor of charter schools.[4]  It declared

> that the establishment of charter schools as part of this State's program of public education can assist in promoting comprehensive educational reform by providing a mechanism for the implementation of a variety of educational approaches which may not be available in the traditional public school classroom. Specifically, charter schools offer the potential to improve pupil learning; increase for students and parents the educational choices available when selecting the learning environment which they feel may be the most appropriate; encourage the use of different and innovative learning methods; establish a new form of accountability for schools; require the measurement of learning outcomes; make the school the unit for educational improvement; and establish new professional opportunities for teachers.
>
> The Legislature further finds that the establishment of a charter school program is in the best interests of the students of this State and it is therefore the public policy of the State to encourage and facilitate the development of charter schools.
>
> [N.J.S.A. 18A:36A-2.]

---

[4]  "[A] charter school is a public school operated pursuant to a charter approved by the Commissioner of Education," and is "independent of a local board of education" and "managed by a board of trustees." Englewood, 164 N.J. at 319-20 (citing N.J.S.A. 18A:36A-3).

24

Consistent with that declaration of public policy, the Legislature directed the Commissioner to "establish a charter school program which shall provide for the approval and granting of charters to charter schools pursuant to the provisions of this act," N.J.S.A. 18A:36A-3(a), and to "actively encourage the establishment of charter schools in urban school districts with the participation of institutions of higher education," id. at -3(b).

Under the Act, an applicant seeking to establish a charter school may submit an application to the Commissioner and the local board of education or, in the case of a district under State supervision, the State district superintendent. N.J.S.A. 18A:36A-4(c). "The board of education or State district superintendent shall review the application and forward a recommendation to the [C]ommissioner," who may grant or deny the application. Ibid. "The local board of education or a charter school applicant may appeal the" Commissioner's determination directly to the Appellate Division. Id. at -4(d).

The Commissioner's grant of a charter is for a four-year period, and the charter may be renewed for a five-year period. N.J.S.A. 18A:36A-17. The Commissioner may revoke a charter if the school has not fulfilled a condition of its grant, or place a charter school on probationary status. Ibid.

The Commissioner must "annually assess whether each charter school is meeting the goals of its charter, and shall conduct a comprehensive review prior to granting a renewal of the charter." N.J.S.A. 18A:36A-16(a).

From the inception of New Jersey's charter school program, the Legislature prescribed an open and non-discriminatory admissions procedure for the schools:

> A charter school shall be open to all students on a space available basis and shall not discriminate in its admission policies or practices on the basis of intellectual or athletic ability, measures of achievement or aptitude, status as a person with a disability, proficiency in the English language, or any other basis that would be illegal if used by a school district; however, a charter school may limit admission to a particular grade level or to areas of concentration of the school, such as mathematics, science, or the arts. A charter school may establish reasonable criteria to evaluate prospective students which shall be outlined in the school's charter.
>
> [N.J.S.A. 18A:36A-7.]

Pursuant to N.J.S.A. 18A:36A-11(b), charter schools "shall comply with the provisions of [N.J.S.A. 18A-46-1 to -55] concerning the provision of services to students with disabilities."

The Act prescribes three enrollment preferences, two mandatory and one permissive:

> a. Preference for enrollment in a charter school shall be given to students who reside in the school district in

26

which the charter school is located. If there are more applications to enroll in the charter school than there are spaces available, the charter school shall select students to attend using a random selection process. A charter school shall not charge tuition to students who reside in the district.

b. A charter school shall allow any student who was enrolled in the school in the immediately preceding school year to enroll in the charter school in the appropriate grade unless the appropriate grade is not offered at the charter school.

c. A charter school may give enrollment priority to a sibling of a student enrolled in the charter school.

[N.J.S.A. 18A:36A-8(a) to (c).]

The Legislature directed that "[t]he admission policy of the charter school shall, to the maximum extent practicable, seek the enrollment of a cross section of the community's school age population including racial and academic factors." Id. at -8(e); see also Englewood, 164 N.J. at 327 (noting that the provision "reflect[ed] the importance that the legislators placed on the need to maintain racial balance in the charter schools").

The Legislature empowered the State Board of Education to "adopt rules and regulations pursuant to the 'Administrative Procedure Act' [N.J.S.A. 52:14B-1 to -31], necessary to effectuate the provisions" of the Charter School Act. N.J.S.A. 18A:36A-18. The regulations adopted pursuant to the Act set

27

forth the procedures for the two categories of applications relevant to this appeal, renewals of charters and amendments of charters.

N.J.A.C. 6A:11-2.3 governs the procedure for charter renewals. The regulation directs the Commissioner to "grant or deny" a renewal application based on twelve enumerated criteria. N.J.A.C. 6A:11-2.3(b)(1) to (12). It provides that "[t]he Commissioner shall notify a charter school regarding the granting or denial," and "[t]he notification to a charter school that is not granted a renewal shall include reasons for the denial." Id. at -2.3(d). The regulation does not address an obligation to explain the basis for granting a renewal. See ibid.

N.J.A.C. 6A:11-2.6 addresses charter amendments. After a charter school applies to amend its charter, "[t]he Department shall determine whether the amendments are eligible for approval and shall evaluate the amendments based on [the Charter School Act and its implementing regulations]. The Commissioner shall review a charter school's performance data in assessing the need for a possible charter amendment." N.J.A.C. 6A:11-2.6(b). "The district board(s) of education or State district superintendent(s) of the district of residence of a charter school may submit comments" on the proposed amendment. Id. at -2.6(c). "The Commissioner may approve or deny

28

amendment requests of charter schools and shall notify charter schools of decisions." Id. at -2.6(d).

Pursuant to N.J.A.C. 6A:11-2.5, "[a]n eligible applicant for a charter school, a charter school, or a district board of education or State district superintendent of the district of residence of a charter school may file an appeal according to N.J.S.A. 18A:6-9.1."[5]

## B.

The Legislature's declaration of public policy in the Charter School Act and the regulations implemented pursuant to the statute provided the setting for our decision in Englewood. There, three boards of education asserted a facial constitutional challenge to the Act, claiming that the statute violated "principles of equal protection and due process," that it violated "the prohibition against the donation of public funds for private purposes," and that it constituted "an improper delegation of legislative power to a private body." Englewood, 164 N.J. at 318-19. They also asserted as-applied challenges to the Act and the regulations, based on the Commissioner's grant of charters to new charter schools in their districts. Id. at 319.

---

[5] Previously, appeals of the Commissioner's decisions on applications for charter schools were taken to the State Board of Education. See N.J.A.C. 6A:4-2.5 (2005). In 2008, however, the Legislature made all decisions of the Commissioner "arising under the school laws" appealable directly to the Appellate Division. See L. 2008, c. 36, § 1 (codified at N.J.S.A. 18A:6-9.1(a)).

The Court upheld the statute's constitutionality, finding that "[t]he choice to include charter schools among the array of public entities providing educational services to our pupils is a choice appropriately made by the Legislature so long as the constitutional mandate to provide a thorough and efficient system of education in New Jersey is satisfied." Id. at 323 (citing Robinson v. Cahill, 62 N.J. 473, 508-09 & 509 n.9 (1973)).

The Court's holding that the Act was constitutional, however, was premised on two requirements imposed on the Commissioner: a mandate that the Commissioner address the issue of segregative effect, and a requirement that the Commissioner assess the question of fiscal harm if the district of residence makes an initial showing of such harm. Id. at 323-36; see also In re Quest Acad., 216 N.J. at 377-78 (noting the segregative effect and fiscal harm requirements imposed by case law on the Commissioner's review of a charter school application).

The Court first addressed the prospect that the growth of charter schools would exacerbate racial segregation. Englewood, 164 N.J. at 323-30. It noted that in past decisions, it had "exhorted the Commissioner to exercise broadly his statutory powers when confronting segregation, whatever the cause." Id. at 325 (citing Jenkins v. Morris Sch. Dist., 58 N.J. 483, 506-07 (1971)). The Court cited the Legislature's admonition in N.J.S.A. 18A:36A-8(e) that charter

30

schools should, "to the maximum extent practicable," seek to enroll "a cross-section of the community's school age population, including racial and academic factors." Id. at 324-26. The Court held

> that the Commissioner must assess the racial impact that a charter school applicant will have on the district of residence in which the charter school will operate. We express no view on the formality or structure of that analysis except to state that it must take place before final approval is granted to a charter school applicant. We otherwise leave the form and structure of that analysis to the Commissioner and State Board to determine.
>
> [Id. at 329.]

Pursuant to Englewood, the Commissioner's obligation to address the segregative effect of a charter school is not contingent on a showing by the district of residence that the charter school would have such a segregative effect. See id. at 328-29. That obligation is imposed even if the district raises no concerns about the charter school's segregative impact. See ibid.

In the wake of Englewood, the Department promulgated two regulations codifying the Commissioner's duty to consider a charter school's segregative effect on its district of residence. 32 N.J.R. 3560(a) (Oct. 2, 2000). Prior to approving a new charter school, "the Commissioner shall assess the student composition of a charter school and the segregative effect that the loss of the

31

students may have on its district of residence." N.J.A.C. 6A:11-2.1(j).[6] The Commissioner must conduct a similar assessment during the annual review of an existing school, basing that assessment "on the enrollment from the initial recruitment period [for the upcoming school year] pursuant to N.J.A.C. 6A:11-4.4(b)." N.J.A.C. 6A:11-2.2(c).

Although this Court's decision in Englewood addressed only a charter school's initial application, not a renewal or amendment application, another regulation promulgated after that decision requires the Commissioner to review "[t]he annual assessments of student composition of the charter school" when the school seeks to renew its charter. N.J.A.C. 6A:11-2.3(b)(8).[7]

Thus, the Commissioner is required to assess a charter school expansion's impact on the district's racial and ethnic balance "during the charter school's initial application, continued operation, and charter renewal application." In re Red Bank Charter Sch., 367 N.J. Super. 462, 472 (App. Div. 2004) (citing former N.J.A.C. 6A:11-2.1(i) and -2.2(c)).

In Englewood, the Court also defined the Commissioner's obligation to analyze the fiscal impact of a charter school approval on the district of

---

[6] The relevant regulation initially appeared as N.J.A.C. 6A:6A:11-2.1(i) and has since been renumbered to -2.1(j). See 32 N.J.R. 3560(a) (October 2, 2000); 39 N.J.R. 2242(a) (June 4, 2007); 45 N.J.R. 26(a) (Jan. 7, 2013).

[7] The relevant regulation initially appeared as N.J.A.C. 6A:11-2.3(b)(7), see 32 N.J.R. 3560(a), but has since been renumbered to (b)(8), 45 N.J.R. 26(a).

residence, but limited that obligation to settings in which the district makes a preliminary showing of fiscal harm. 164 N.J. at 330-36; see also In re Quest Acad., 216 N.J. at 378.

The Court acknowledged that the three boards of education challenging the constitutionality of the Charter School Act predicted "dire consequences" to their districts, but noted that they made no claim that the approval of the contested charter schools would cause them "to cease providing a thorough and efficient education" to the students remaining in district-operated schools. Englewood, 164 N.J. at 331. The Englewood Court reiterated the Commissioner's continuing obligation to be vigilant about the "district of residence's continuing ability to provide a thorough and efficient education to its remaining pupils." Id. at 334.

The Court noted, however, that the Act and an implementing regulation "entitle[d] the district[s] of residence to analyze the charter school applicant's submission to the Commissioner and to challenge or augment the applicant's submitted information." Ibid. (citing N.J.S.A. 18A:36A-4(c); N.J.A.C. 6A:11-2.1). It also cited the funding mechanism then in effect under N.J.S.A. 18A:36A-12, which required a district to pay "a presumptive amount equal to 90% of the local levy budget per pupil for the specific grade level in the district," with the Commissioner retaining limited discretion to require

33

payment of a percentage of that per-pupil budget lower or higher than 90%.

Id. at 330-31 (citing N.J.S.A. 18A:36A-12 (2000)).  The Court noted that the

Legislature had "heard and addressed" fiscal concerns expressed by districts of

residence:  it made "the adjustments to Section 12 of the Act, which now

contains the 90% presumptive amount provision," and authorized districts to

retain the remaining funding.  Id. at 335.

The Court concluded that "[r]ead in combination," N.J.S.A. 18A:36A-

4(c)'s provision for district comments on a charter school application and

N.J.S.A. 18A:36A-12's funding mechanism "require a district of residence to

make an initial showing that imposition of the presumptive amount, or a

proposed different amount for the charter school applicant's pupils would

impede, or prevent, the delivery of a thorough and efficient education in that

district."  Id. at 334.  The Englewood Court held

> that the Commissioner must consider the economic
> impact that approval of a charter school will have on a
> district of residence when during the approval process
> a district makes a preliminary showing that satisfaction
> of the thorough-and-efficient education requirements
> would be jeopardized.  That information is necessarily
> pertinent to the Commissioner's determination of
> whether to approve a charter school applicant and use
> the presumptive per-pupil funding amount set by the
> Legislature in the Act, or to use any different amount.
> However, the district must be able to support its
> assertions.  We do not impose on the Commissioner the
> burden of canvassing the financial condition of the
> district of residence in order to determine its ability to

34

adjust to the per-pupil loss upon approval of the charter school based on unsubstantiated, generalized protests. The legislative will to allow charter schools and to advance their goals suggests our approach which favors the charter school unless reliable information is put forward to demonstrate that a constitutional violation may occur.

[Id. at 336.]

The Court noted in Englewood that "application of this standard in the context of an Abbott district is not part of this case," and left "that question for another day." Id. at 334.

Following this Court's decision in Englewood, the Appellate Division held that the Commissioner's duty to assess fiscal harm in a charter school approval decision, if the district of residence presents a preliminary showing of such harm, applies with equal force to the renewal setting. Red Bank, 367 N.J. Super. at 482-83. The court observed that "[a]s in the initial approval process, 'the district must be able to support its assertions' with some specificity." Id. at 482 (quoting Englewood, 164 N.J. at 336).

Thus, a district's duty under Englewood to present a preliminary showing of fiscal harm sufficient to imperil its provision of a thorough and efficient education -- a showing sufficient to trigger the Commissioner's analysis of the charter school's fiscal impact -- applies to the renewal and amendment settings of this appeal. Id. at 482-83.

IV.

A.

Against that backdrop, we review the Commissioner's February 2016 decisions granting the renewal and amendment requests of the seven charter schools.

We will not overturn an agency determination unless it is arbitrary, capricious, or unreasonable. In re Att'y Gen. Law Enf't Directive Nos. 2020-5 and 2020-6, ___ N.J. ___ (2021) (slip op. at 29) (citing In re State & Sch. Emps.' Health Benefits Comm'ns' Implementation of Yucht, 233 N.J. 267, 279 (2018)). The party challenging the agency action has the burden to show that the administrative determination is arbitrary, capricious or unreasonable. Id. at ___ (slip op. at 29) (citing Lavezzi v. State, 219 N.J. 163, 171 (2014)).

The deferential standard that governs administrative appeals

> is consistent with "the strong presumption of reasonableness that an appellate court must accord an administrative agency's exercise of statutorily delegated responsibility." The standard also recognizes the "agency's expertise and superior knowledge of a particular field," as well as the Judiciary's "limited role . . . in reviewing the actions of other branches of government."
>
> [Id. at ___ (slip op. at 29-30) (omission in original) (citations omitted).]

36

As we have stated in the setting of a review of the Commissioner's denial of a charter school application,

> the judicial role [in reviewing an agency action] is generally restricted to three inquiries: (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Quest Acad., 216 N.J. at 385-86 (alteration in original) (quoting Mazza v. Bd. of Trs., PFRS, 143 N.J. 22, 25 (1995)).]

As the Appellate Division correctly noted in deciding the charter school renewal and amendment applications, the Commissioner was not obliged to provide "the kind of formalized findings and conclusions necessary in the traditional contested case." In re TEAM Acad., 459 N.J. Super. at 140 (quoting In re Englewood on the Palisades Charter Sch., 320 N.J. Super. 174, 217 (App. Div. 1999), aff'd as modified, 164 N.J. 316 (2000)).

For "more policy-driven, quasi-legislative acts" such as those at issue here, "the record may be less extensive" than the record of a contested case. In re Att'y Gen. Directives, ___ N.J. at ____ (slip op. at 32) (citing In re Adoption of Amends. & New Regs. at N.J.A.C. 7:27-27.1, 392 N.J. Super. 117, 135-36 (App. Div. 2007)).

37

The basis for the determination, however, "must be discernible from the record" considered by the agency. Red Bank, 367 N.J. Super. at 476; see also In re Quest Acad., 216 N.J. at 385, 387 (noting that the appellate court's determination whether the record contains "substantial evidence to support the findings on which the agency based its action" (quoting Mazza, 143 N.J. at 25) requires "a sifting of the record, and the ability to find support for the conclusions reached by the Commissioner under the statutory framework within which she must act"); In re Vey, 124 N.J. 534, 544 (1991) ("When the absence of particular findings hinders or detracts from effective appellate review, the court may remand the matter to the agency for a clearer statement of findings and later reconsideration." (citing Application of Howard Sav. Inst., 32 N.J. 29, 53 (1960))).

## B.

We first consider whether the Commissioner was required to analyze the fiscal harm to the District as a result of the proposed charter school expansions. As the parties agree, although the District provided comments about all but one of the disputed charter school applications, as N.J.A.C. 6A:11-2.3(b)(9) and -2.6(c) authorized it to do, it made no preliminary showing that its provision of a thorough and efficient education to its students would be jeopardized by the enrollment expansions sought by the charter

38

schools. See In re Quest Acad., 216 N.J. at 377-78; Englewood, 164 N.J. at 336.

ELC argues the District should be exempt from the requirement of a preliminary showing. It asks the Court to impose on the Commissioner the burden to convincingly demonstrate that the approval or expansion of Newark charter schools will not impair the District's ability to deliver a thorough and efficient education.

ELC urges the Court to adopt a heightened standard in the setting of this appeal on two grounds. First, it notes that in Englewood, 164 N.J. at 334, the Court left open the question whether an Abbott district must make such a preliminary showing before the Commissioner is required to analyze fiscal harm, and argues that the fiscal challenges confronting former Abbott districts warrant particular vigilance as to the impact of charter schools. Second, ELC asserts that by virtue of the District's State-operated status when the charter schools submitted their applications, the Commissioner was obliged to review the question of fiscal harm with or without a preliminary showing from the District.

We disagree. We concur with the Appellate Division that in light of the Legislature's enactment of SFRA, N.J.S.A. 18A:7F-43 to -70, there is no reason to exempt former Abbott districts from Englewood's general

39

requirement of a preliminary showing of fiscal harm. See In re TEAM Acad., 459 N.J. Super. at 142-43. In SFRA, the Legislature imposed "a weighted funding formula designed to calculate school aid allocations for individual districts using both wealth-equalized and categorical aid components." Abbott v. Burke (Abbott XXI), 206 N.J. 332, 351 n.13 (2011) (citing Abbott v. Burke (Abbott XX), 199 N.J. 140, 152, 153, 155-57 (2009)). That funding formula governs all districts, including those formerly designated as Abbott districts. See generally N.J.S.A. 18A:7F-43 to -70.

In SFRA, the Legislature also altered the charter school funding formula that was in effect when the Court decided Englewood, eliminating the Commissioner's discretion with respect to the percentage of per-student funding that the district must transfer to a charter school, and limiting the fiscal impact of a student's enrollment in a charter school. L. 2007 c. 260, § 58 (amending N.J.S.A. 18A:36A-12). As amended, the Charter School Act's funding provision states in part:

> The school district of residence shall pay directly to the charter school for each student enrolled in the charter school who resides in the district an amount equal to 90% of the sum of the budget year equalization aid per pupil, the prebudget year general fund tax levy per pupil inflated by the [Consumer Price Index] rate most recent to the calculation, and the employer payroll tax per pupil that is transferred to the school district pursuant to subsection d. of section 1 of L. 2018, c. 68. In addition, the school district of residence shall pay

40

directly to the charter school the security categorical aid attributable to the student and a percentage of the district's special education categorical aid equal to the percentage of the district's special education students enrolled in the charter school and, if applicable, 100% of preschool education aid. The district of residence shall also pay directly to the charter school any federal funds attributable to the student.

[N.J.S.A. 18A:36A-12(b).]

As the Appellate Division noted, following SFRA, "[t]he Commissioner no longer has merely the discretion to reduce funding rates for charter school children; the Commissioner must implement the SFRA formula." In re TEAM Acad., 459 N.J. Super. at 144 (citing N.J.S.A. 18A:36A-12(b)). In Abbott districts, as in other districts, the district is assured that it will retain 10% of the per-student funding, as defined in N.J.S.A. 18A:36A-12(b), notwithstanding the student's enrollment in a charter school. Accordingly, district officials now have greater certainty about the fiscal consequences of a charter school expansion.

Given the Legislature's reform of the school funding formula and its amendment to the charter school funding mechanism in the Act, there is no reason to exempt former Abbott districts from the general rule requiring a district to preliminarily demonstrate fiscal harm, or to impose on the Commissioner the burden to demonstrate the absence of such harm in every charter application in those districts.

Moreover, the practical considerations identified by the Commissioner apply in equal measure to former Abbott districts and other school districts. Administrators and staff in a given district are uniquely familiar with the details of the annual budget; anticipated changes in enrollment, staffing and programs; and the fiscal impact of charter schools on district operations in prior years. Any order requiring the Commissioner to analyze the finances of every former Abbott district before ruling on a charter school application -- whether or not a district makes a claim of fiscal harm -- would impose an untenable and unnecessary burden on the Department's resources.

The preliminary showing requirement imposed in Englewood provides an equitable solution; it allocates the initial burden to make a preliminary showing to the district but requires the Commissioner to analyze fiscal harm if the district makes that showing. That standard is workable and fair for former Abbott districts, as it is for other districts of residence.

Nor does the District's former status as a State-operated school district warrant an exception to Englewood's mandate that the district of residence present a preliminary showing of fiscal harm. A State district superintendent appointed to supervise the schools of a district is authorized to "perform all acts and do all things that the [C]ommissioner deems necessary for the proper conduct, maintenance and supervision of the schools in the district." N.J.S.A.

42

18A:7A-35(e).  The Charter School Act's implementing regulations empower a State district superintendent to address charter school applications, just as the board of education of a locally operated school district is authorized to do. See N.J.A.C. 6A:11-2.3(b)(9) (renewal of charters); N.J.A.C. 6A:11-2.5 (appeals of charter school determinations); N.J.A.C. 6A:11-2.6(c) (amendments to charters).  Any holding by this Court dispensing with the requirement of a preliminary showing of fiscal harm by State-operated districts would be inconsistent with the Legislature's expectation that a State-appointed superintendent will effectively represent the a district's interests with respect to charter schools.

In short, there is no reason to diverge in this appeal from the requirement imposed in Englewood that a district must provide a preliminary showing of fiscal harm sufficient to imperil its provision of a thorough and efficient education to its students in order to trigger the Commissioner's responsive duty to assess the question of fiscal harm.  See Englewood, 164 N.J. at 330-36. Because the District made no such showing, the Commissioner was not required to address the question of fiscal harm before approving the seven charter school applications at issue here.

C.

1.

We agree with ELC and its supporting amici that the Commissioner's decisions granting renewals or amendments to the seven respondent charter schools did not include any reference to the charter schools' potential impact on racial segregation in the district schools, much less the careful consideration of that issue that Englewood requires. See In re Quest Acad., 216 N.J. at 377-78; Englewood, 164 N.J. at 323-30; Red Bank, 367 N.J. Super. at 471. The decisions are therefore deficient.

In future determinations of applications for approval of charter schools pursuant to N.J.S.A. 18A:36A-4.1 and -5 and N.J.A.C. 6A:11-2.1, applications for renewals of charters pursuant to N.J.S.A. 18A:36A-17 and N.J.A.C. 6A:11-2.3, and applications for amendments of charters pursuant to N.J.A.C. 6A:11-2.6, the Commissioner should address the impact of the charter school's approval, renewal or amendment on racial segregation in the district of residence. The Commissioner should also address the impact of the charter school's approval, renewal or amendment on the demographic composition of the district of residence with respect to two groups of students of particular concern to the Legislature, students with disabilities and students who are English language learners. See N.J.S.A. 18A:36A-7 (prohibiting

44

discrimination in charter school admissions based, among other factors, on the student's "status as a person with a disability" and "proficiency in the English language"); N.J.S.A. 18A:36A-16(e)(5) (defining "comparative demographics of student enrollments in school districts of residence," for purposes of a report on charter schools to be prepared by the Commissioner, to include "enrollment of special education students" and "enrollment of students of limited English proficiency").

The Commissioner's careful analysis of those issues, along with the other factors prescribed in the governing statutes and regulations, will further the Legislature's objectives in the Charter School Act, satisfy the requirements of Englewood, and facilitate fair and effective appellate review of charter school determinations.

2.

Although the Commissioner did not conduct the segregative-impact analysis that Englewood required, a remand of these matters to the Commissioner five years after the decisions would not serve the interests of Newark's charter school students or their families.

ELC appeals seven discrete administrative determinations, each specific to the status of an individual school at a particular point in time. By statute and regulation, the Commissioner's authority was limited to the disposition of

45

the specific applications before him; he was empowered to grant or deny, in whole or in part, those applications, to impose probationary status on the charter school, or to implement a remedial plan. See N.J.S.A. 18A:36A-17; N.J.A.C. 6A:11-2.3(b); N.J.A.C. 6A:11-2.6(d). The import of a denial is clear: the charter school would be prohibited from increasing its enrollment.

Were we to remand for reconsideration of the seven applications, and were ELC to prevail on remand or in a subsequent appeal, the normal remedy available to the Commissioner would be a retroactive denial and unwinding of the expansion applications granted to the seven charter schools in 2016. The charter schools would have no alternative but to remove students from their enrollment and rescind commitments to students for the next school year. Such a remedy would severely impact Newark's charter school students and their families, and would subvert the Legislature's policy to expand educational opportunities. It would also undermine the Commissioner's intervening and future decisions on charter school expansion applications, which were premised on post-2016 enrollment data.

ELC and the District insist that they do not seek to remove students from the charter schools. As an alternative to such a remedy, they urge the Court to instruct the Commissioner to prospectively deny or limit pending and future

applications to expand Newark charter schools so that the schools' collective enrollments return to pre-2016 levels.

We decline to play such an active role, in which the Court would interfere with educational determinations that are imbued with the expertise of the Commissioner and the Department's staff. Such a global and prospective order would not be an appropriate remedy in the seven renewal and amendment applications at issue here. See N.J.S.A. 18A:36A-17; N.J.A.C. 6A:11-2.3(b); N.J.A.C. 6A:11-2.6(d). Such an order would not take into account developments in the intervening years. As the Legislature prescribed, the Commissioner must decide pending and future applications by Newark charter schools to approve, renew, or amend their charters on a case-by-case basis, applying the factors that govern those applications. It is not for this Court to prospectively direct the Commissioner's determinations.

Accordingly, we leave undisturbed the Commissioner's decisions granting the seven charter school applications at issue here.

## V.

The judgment of the Appellate Division is affirmed as modified.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE PATTERSON's opinion.

47